James L. Boyett v. Commissioner. Velora Boyett v. Commissioner. James L. Boyett and Velora Boyett, Husband and Wife v. Commissioner.
Boye v. . Comm'n
Docket Nos. 24829, 24830, 24831.
United States Tax Court
1951 Tax Ct. Memo LEXIS 296; 10 T.C.M. (CCH) 237; T.C.M. (RIA) 51067; March 14, 1951
Geo. S. Atkinson, Esq., Tom B. Rhodes, Jr., Esq., John C. Box, Jr., Esq., Arthur Squyres, C.P.A., 560 Fair Foundation Bldg., Tyler, Tex., and Kenneth W. Hurst, C.P.A., for the petitioners. Donald P. Chehock, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings, consolidated for hearing, involve deficiencies in income tax for the calendar years 1942 to 1947, inclusive, and 50 per cent fraud penalties as follows: Docket No.
Petitioner
Year
Deficiency
50% Penalty
24829
James L. Boyett
1945
$ 736.90
$ 368.45
1946
3,554.80
1,777.40
1947
216.00
108.00
24830
Velora Boyett
1945
736.90
368.45
1946
3,554.80
1,777.40
1947
216.00
108.00
24831
James L. Boyett and Velora Boyett
1942
700.30
350.15
1943
2,853.26
1,404.18
1944
3,258.00
1,629.00
*297 The questions presented are: (1) Did petitioners correctly report their income for the years 1942 to 1947, inclusive? (2) Are petitioners liable for the fraud penalties asserted by respondent for those years? Other issues raised have been settled by stipulation, which is incorporated herein by reference. Findings of Fact Petitioners are husband and wife residing in Jacksonville, Texas. They were married September 26, 1914, at Ruston, Louisiana, and have one son, Harold, born December 1, 1917, a major in the United States Air Force at the time of the hearing. Petitioners filed joint returns for the years 1942, 1943 and 1944, and separate returns for the years 1945, 1946 and 1947, with the collector of internal revenue for the second district of Texas. The returns state they were made on the cash basis. James L. Boyett (hereinafter referred to as petitioner), was born July 10, 1892, on a farm near Simms, Louisiana. Two years later his parents moved to another farm near Pollock, Louisiana. The family made this farm their home until about 1910. Petitioner's father died in 1901, leaving only a leasehold estate in the farm, improvements and stock. Petitioner's mother remarried *298 in 1903. Petitioner had three brothers and two sisters, two half-brothers, and one half-sister. One brother and the half-sister were older than petitioner. The rest were younger. His uncle, J. W. Boyett (who died in 1941), his brother-in-law, W. E. Robertson, then aged about 30, his older brother, W. E. Boyett, and petitioner operated the farm from 1904 to 1910, selling peaches, wood and cattle. His stepfather worked at sawmill jobs and had very small earnings, and his younger brothers and sisters were not wellfed or well-clothed. By 1910 most of the peach trees had died of disease, and petitioner and his mother disposed of the cattle, tools, wagons and improvements on the farm and moved to Winnfield, Louisiana. Less than $100 was received for the tools, wagons and improvements. Petitioner worked in a grocery store from 1910 until 1911. He then bought a confectionery and operated it two or three years. He sold it and then leased a pool hall for several months. He then worked as an assistant pharmacist during 1915, 1916 and up until June, 1917. In a sworn application for compensation and vocational training filed with the Veterans Bureau in December, 1922, he stated that he worked *299 as an assistant pharmacist at $75 per month in 1915, 1916 and 1917, and that he was not engaged in any other occupation or trade. Petitioner was in the military service from June 19, 1917, to May 17, 1919, as a master hospital sergeant in the United States Army. He worked as an assistant pharmacist from July 16, 1919, until 1922. In the sworn Veterans Bureau application mentioned above he stated he worked from July 16, 1919, to December, 1922, as an assistant pharmacist for $150 per month and that he had no other occupation. On or about March, 1923, he entered Soule College, in New Orleans, Louisiana, where he remained for three or four months. During this time he held an outside drug store job. Later in 1923 he entered the College of Dentistry of Tulane University, graduating in 1927. During the time in school from 1923 to 1927, he received $145 per month from the Government as a result of his application for vocational training made on November 24, 1922, plus tuition, books and instruments. During the summer months of 1923 to 1927, inclusive, he received compensation payments varying from $18.04 per month to $44 per month. Other than these payments during this school period he *300 received disability compensation payments from the Government from November 16, 1920, to the time of the hearing, ranging from $9 to $18.05 per month, except for a five-day period in 1923. He acquired a house and lot in Mobile, Alabama, in 1921 for $6,250, which he sold in 1945 for $3,500. In 1922 petitioner Velora Boyett took a refresher course in typing at Soule College and then worked for a few months in 1922 in a store for $25 a week. From 1933 to 1937 she attended a teachers' college in Nacogdoches, Texas. Petitioner paid for the college education of both his wife and son. From 1937 through the taxable years 1947 she taught homemaking in a rural school. This constitutes the only work she has done outside the home, since marriage, except for the few months in a store in 1922. Her income tax returns reflect that her gross income from teaching from 1941 through 1947 has ranged from about $1,000 to $1,600 per year. From March 18, 1935, to October 25, 1939, she had a checking account showing deposits mostly of $50 and $100 amounts, with the highest balance for any one time $314.30. From December 6, 1941, to November 25, 1946, she had a checking account in the First National Bank *301 at Jacksonville, showing deposits mostly of $100, or there-abouts, and a balance in the account ranging from $100 to a high of $1,893.31 on August 15, 1944. On November 25, 1946, the balance of $483.86 was checked out of the account. From January 1, 1942, up until May 22, 1946, she deposited in this account $3,722.25 and for this same period reported as income from her employment as a teacher approximately $4,383.95, including 5/12ths of 1946 salary income. No income tax returns were filed by petitioners prior to 1941. A Bureau return was filed for petitioners for the year 1940. Petitioner practiced dentistry at Frankston, Texas, from 1927 to 1934, renting office space $10for per month. During this period he borrowed small sums from the First State Bank at Frankston at an interest rate of 8 to 10 per cent. From July 2, 1931, to February 19, 1941, the bank records showed continual small loans and payments, the largest single loan for this period being $257.50 and the largest balance owed at any one time being $461.80. About 1929 or 1930 petitioner rented a 17 7/8 acre tract of land with some improvements in Frankston from one G. L. Billingsley, upon which land petitioner raised *302 some chickens and did a little truck gardening. On May 18, 1931, he bought the land, making cash payments totaling $886.45 and executing eight notes of $134.05 each and eight notes of $309.05 each, the notes due serially one a year secured by a deed of trust on the land. The notes drew interest at 8 per cent until maturity and 10 per cent thereafter. Petitioner defaulted, the land was sold on January 2, 1934, and applied on the indebtedness, and judgment thereafter taken on April 29, 1935, against petitioner for $4,029.32. The judgment of $4,029.32 was made up of $2,444.80 principal, $1,218.22 interest and $366.30 attorney's fees. After taking judgment on April 29, 1935, Billingsley never got out any executions, and under Texas law its collection was barred after 10 years. On March 25, 1935, judgment for $110 was taken against petitioner by the Garnett Church Furniture Company, which judgment has never been satisfied. The indebtedness arose from a $100 note for furniture he had given in lieu of cash as a contribution to a church in the early 1930's. Another judgment was taken on October 14, 1935, by the Magnolia Petroleum Company for $32.35, which judgment was later released. In *303 1934 petitioners moved to Jacksonville, Texas, and have lived there ever since. From 1934 to 1936 petitioner returned to Frankston three afternoons a week, giving up his office in Frankston in the fall of 1936 because he became too busy in Jacksonville to maintain both offices. At Jacksonville he has maintained offices in the Texas State Bank Building. On or about January 1, 1935, he purchased furniture and equipment costing approximately $5,000 for his dental offices in Jacksonville. In 1942 his office had four rooms consisting of two operating rooms, a reception room and recovery room. In 1942 the reception room was about 11feet 8inch by 11feet 8inch, with chairs to accommodate about five or six people. On or about January 1, 1943, or possibly a short time before that, the reception room was almost doubled in space. Another divan and chairs were added to the reception room to accommodate in all ten to twelve people. Also another operating room and modern equipment were added. The alterations cost petitioner $936.95, and the new furniture and equipment $2,500. From 1943 through 1947 he operated three chairs, two for white patients and one for colored patients. From 1942 to 1947 he *304 estimated one-third to one-fourth his business was cash. Petitioner was a general dental practitioner. From 1942 through 1947 he had a waiting list, with appointments five and six weeks to three months in advance. During this period he turned away many patients. Ann Newman worked full time for him from 1935 to May, 1939, and then worked again for him about one week in September, 1940. For her services she received $5 a week, then $8 a week, and her top wage was $10 a week. Marie Sales started working for him in March, 1943, and has continued since. Her wages increased from $9 a week to $25 a week through 1947. Petitioner's practice grew steadily and he has worked regularly, except for Thursday and Saturday afternoons, holidays, and occasional brief illnesses. In 1939 and 1940 petitioner bought five lots in Jacksonville, purchasing all of them in the name of Harold Boyett, his son. For each of them a small cash payment was made, with mortgage or vendor's lien notes assumed or executed for the balance, drawing 8 per cent interest. On October 20, 1939, petitioner bought a lot for $550 by paying $50 cash down, giving for the balance a vendor's lien note of $500 at 8 per cent interest, *305 payable $10 a month, which was paid January 18, 1941. On October 20, 1939, he also bought another lot for $550 by paying $250 cash down, giving for the balance a vendor's lien note of $300 at 8 per cent interest, payable $10 a month, which was paid January 18, 1941. On October 24, 1939, petitioner bought another lot for $3,350 by paying $709.72 cash, assuming a mortgage of $2,290.28 and giving a vendor's lien note for the balance of $350 at 8 per cent interest, payable $25 a month, balance due on mortgage and note being paid on January 18, 1941. Again on September 5, 1940, petitioner bought two lots for $750 by paying $90 cash down and giving a vendor's lien note for the balance of $660 at 8 per cent interest, payable $20 a month. Except for the accounts in Velora Boyett's name described above and a few small deposits in petitioner's name in 1935, and in 1946 and 1947, all bank deposits of petitioners since about 1935 have been in other people's names. From 1935 to the time of the hearing his main business account has been the Ann Newman account in the Texas State Bank at Jacksonville. Ann Newman was petitioner's office assistant from 1935 to 1940. After 1940 he continued to keep *306 his bank account in her name, and the account was exclusively his, not hers. Usually from one to two deposits were made a week. On April 8, 1943, Harold Boyett gave petitioner a broad general power of attorney. Thereafter petitioner used Harold's name to transact his own personal business. During 1943, 1944 and 1945 and 1946 petitioner made cash deposits of business income, or other income, in the Harold Boyett accounts in the two Jacksonville banks, none of which income was reported by petitioners in their income tax returns. These deposits of petitioners' income in the Harold Boyett accounts include a cash deposit of $2,750 on October 13, 1943, in the Texas State Bank; a cash deposit of $2,400 on the same date in the First National Bank; a deposit of check of $175 of W. E. Boyett in the First National Bank on November 24, 1943; a cash deposit of $2,500 on December 15, 1943, in the First National Bank; a cash deposit of $6,000 on March 1, 1944, in the Texas State Bank; a cash deposit of $2,000 on July 13, 1944, in the Texas State Bank; a deposit of a $1,000 check of W. E. Boyett on January 16, 1945, and a cash deposit of $18,000 on May 17, 1946, in the Texas State Bank. From 1936 *307 on through the taxable years petitioner consistently followed the practice of cashing many of the checks given him by patients. When his office assistant cashed the checks she gave the cash to the petitioner personally, and he carried it in his pocket. He usually made the bank deposits himself. All of his dental business receipts were not deposited. The only daily record kept by the petitioner of his dental income was in his appointment books and patient cards. These records were incomplete. From 1936 to July 20, 1946, petitioner consistently made deposits in the Ann Newman account of even $100 amounts. Ben Friend, deputy collector, made his first investigation on July 24, 1946. Subsequent to August 1, 1946, odd amounts were deposited. On July 24, 1946, when Friend went to petitioner's office to investigate his 1942 and 1943 returns, petitioner was asked to produce his original records to substantiate the figures on the returns, and he produced his appointment books for 1942 and 1943. Friend looked at each page of the books and summary at the back of the books by months. The items on the pages showed three or four entries on a page, a few pages six or eight entries, with an average *308 of about four entries to the page. The individual collections shown in the books were small. Friend asked petitioner to produce his bank statements. He produced the 1942 and 1943 bank statements of Ann Newman and Velora Boyett. Petitioner stated that he had no bank accounts in his own name because of a judgment. He told Friend, upon inquiry, that he had not deposited all his receipts. Also that he had used part of the money received for expenses. Petitioner was asked if he had other bank accounts and he showed bank statements showing deposits made in the Harold Boyett accounts on October 13, 1943, of $2,750, in one bank, and $2,400 in the other bank. Petitioner was asked where he got this money and he said, "Why, I have had that buried in a can in the back yard". At the time of the deputy collector's investigation in July, 1946, petitioner told him, upon inquiry, that he had no documentary evidence to substantiate the fact the Harold Boyett account deposits were money he had acquired prior to the taxable years. No documentary evidence was in fact ever shown the deputy collector in 1946, or the revenue agent in 1948, of the existence of these funds prior to the taxable years. Friend, *309 a week or two after making the 1942 and 1943 investigation, was asked to make the 1944 investigation. He went through the same procedure then for 1944, first with the appointment book for 1944 and later the bank account records. In the subsequent investigation by the revenue agent in 1948, the appointment books for the years 1945, 1946 and 1947 were never shown the agent. Petitioners filed a joint income tax return for 1941, signed by both petitioners, showing the following income and expenses: Salary (wife - net)
$ 248.00
Rent
65.00
Loss from sale of farm (50% of
$1,338.68)
(669.35)
Business (dental): Gross
$8,043.65
Expenses
5,902.55
2,141.10
Net income
$1,784.75
Petitioners' 1942 joint income tax return, signed by both petitioners, shows the following income and expenses: Salary (wife - net)
$ 385.50
Loss from rental property
(16.00)
Business (dental): Gross
$7,700.00
Expenses
6,586.35
1,113.65
Net income
$1,483.15
This same year (1942) petitioners deposited $8,902.36 in the Ann Newman account almost entirely in even $100 amounts, being $1,202.36 in excess of the gross business income reported. *310 The respondent for the year 1942 included in gross business income the total of deposits in the Ann Newman account of $8,902.36 and deposits in the Velora Boyett account of $972.40, allowed certain credits, leaving total gross business income for 1942 of $8,527.91. Petitioners' 1943 joint income tax return, signed by both petitioners, shows the following income and expenses: Salary (wife - net)
$ 563.40
Loss from rental property
(167.17)
Business (dental): Gross
$10,308.77
Expenses
8,499.03
1,809.74
Taxes
(88.00)
Net income
$2,117.97
Respondent for the year 1943 has included in gross business (or other) income, $10,308.77 of the $13,088.75 deposited in the Ann Newman account plus $7,825 of the deposits in the Harold Boyett accounts. Petitioners' 1944 joint income tax return, signed by both petitioners, shows the following income and expenses: Salary (wife - net)
$ 359.98
Loss from rental property
(416.81)
Business (dental): Gross
$10,896.50
Expenses
7,992.27
2,904.23
Gain from sale of house
270.50
Net income
$3,117.90
Respondent for the year 1944 has included in gross business (or other) income, *311 the $11,300 deposited in the Ann Newman account, to which has been added small amounts deposited in Velora Boyett's account and other items raising this total to $11,547.86, plus the $8,000 deposited in the Harold Boyett account. Petitioners' separate 1945 income tax returns report the following total community income and expenses: Salary (wife - net)
$ 632.99
Rent
288.01
Business (dental): Gross
$13,641.50
Expenses
10,033.50
3,608.00
Loss from sale of house
(34.40)
Mistake in addition on return
100.00
Net income
$4,594.60
Respondent for the year 1945 has included in gross business (or other) income, $14,126.75 of the $15,910.43 deposited in the Ann Newman account plus $1,017.05 of dental checks received by petitioner not deposited, plus $800 loan of petitioner's money to Martha Boyett, petitioner's daughter-in-law, and $1,000 deposited in the Harold Boyett account. Petitioners' separate 1946 income tax returns report the following total community income and expenses: Salary (wife - net)
$1,167.50
Loss from rental property
(244.54)
Sale of assets
1,652.20
Business (dental): Gross
$12,197.82
Expenses
7,751.76
4,446.06
Net income
$7,021.22
*312 Respondent for the year 1946 has included in gross business (or other) income, deposits in the Ann Newman account totaling $11,998.20, miscellaneous additions of $331.94, dental checks totaling $1,630.55 not deposited, $18,000 deposited in the Harold Boyett account,$840 deposited in the Velora Boyett account, and a $1,000 money order procured by petitioner. Petitioners' separate 1947 income tax returns report the following total community income and expenses: Salary (wife - net)
$ 203.95
Rental
21.56
Sale of assets
2,110.15
Business (dental): Gross
$12,348.85
Expenses
8,030.48
4,318.37
Net income
$6,654.03
Respondent for the year 1947 has included in gross business (or other) income $12,477.77 of the $14,049.35 deposited in the Ann Newman account and dental checks totaling $1,280.25 not deposited. Assuming a figure of $3,000 annually for their combined personal living expenses, petitioners from 1942 through 1947 disbursed in known net cash investments, chiefly in bonds and real estate, net payments on loans, and personal living expenses, the following amounts: Year
Amount
1942
$ 4,490.10
1943
13,394.45
1944
12,550.00
1945
3,900.00
1946
20,050.00
1947
3,900.00
*313 Jacksonville, Texas, and Nacogdoches, Texas, are but 52 miles apart, and from 1939 through 1947 were about the same size in population. From 1939 through 1947 both had a population of about 8,000 to 10,000 people. From 1942 to 1947, inclusive, there was about the same number of dentists in each town, Jacksonville possibly having one or two more. Nacogdoches had about four dentists during this period and Jacksonville five or six. Dr. D. Brookshire is a general practitioner of dentistry in Nacogdoches as petitioner is in Jacksonville. Dr. Brookshire graduated from the College of Dentistry of Texas University in 1918, was 54 years of age at the time of the hearing, and started in the practice of dentistry at Nacogdoches in 1937 or 1938. Petitioner graduated from the College of Dentistry of Tulane University in 1927, the president of his class, was 57 years of age at the time of the hearing, and started in the practice of dentistry at Jacksonville in 1934. Petitioner has always been regarded as one of the leading dentists in town, and has the reputation of having one of the best practices of the dentists in Jacksonville. Both took care of colored patients. From 1942 through 1947 Dr. *314 Brookshire operated but two dental chairs while petitioner operated three chairs from 1942 or 1943 through 1947. In the years 1943 through 1947 petitioner's three dental chairs were usually full at the same time, petitioner working from one chair to the other. Dr. Brookshire estimated his income in 1944 was approximately the same as in 1943. The business income of Dr. Brookshire and the business income of petitioner as reported and as determined by respondent are as follows: Petitioner
Petitioner
Per
Dr. Brookshire
Per Return
Determination
(2 Dental Chairs)
(3 Dental Chairs)
by Respondent
Year
Gross
Net
Gross
Net
Gross
1942
$ 23,390.00
$10,824.27
$ 7,700.00
$ 1,113.65
$ 8,527.91
1943
29,600.00
16,609.31
10,308.77
1,809.74
18,133.77
1944
29,600.00
16,609.31
10,896.50
2,904.23
19,547.86
1945
28,560.00
15,083.00
13,641.50
3,608.00
16,943.80
1946
28,112.00
14,081.60
12,197.82
4,446.06
33,800.69
1947
27,495.00
14,212.64
12,348.85
4,318.37
13,758.02
$166,757.00
$87,420.13
$67,093.44
$18,200.05
$110,712.05
Most of the time petitioner carries large sums of money on his person. *315 He sometimes participated in gambling during the taxable years here involved. The $1,017.05 of checks added by respondent to petitioner's income for 1945 (as cashed but not deposited), the $1,630.55 checks added for 1946, and $1,280.25 checks added for 1947, were all amounts received by petitioner from his dental practice and constituted income to petitioners in addition to unexplained bank deposits, except for the following checks. These checks were actually cashed and deposited in the account petitioner kept under the name of "Ann Newman" in the Texas State Bank, and did not constitute income to petitioners in addition to unexplained bank deposits: Recorded
Date on
Date Per
Amount of
Check
Payer of Check
Respondent
Check
4- 5-46
Mrs. R. Max Compton
4-20-46
$ 5.00
4- 8-46
Mrs. G. D. Therrell, Sr.
4-20-46
2.00
4- 9-46
Dean Shank
4-20-46
2.00
4-13-46
Wallace A. Phillips
4-20-46
5.00
4-15-46
Mrs. Thomas A. Scurlock
4-20-46
6.00
4-17-46
Beulah Larson
4-20-46
6.00
4-19-46
James W. Pryor
4-20-46
14.00
4-19-46
W. C. Musick
4-20-46
3.00
7-30-46
Albert W. Sadler
8- 1-46
8.00
8-30-46
Helen Trantham
9- 6-46
$ 4.00
8-30-46
Mrs. M. A. Hopson
9- 6-46
3.00
8-30-46
Johnnie Poole
9- 6-46
5.00
8-31-46
Sybie Lewis
9- 6-46
8.00
12-12-46
Dan Chiles
12-13-46
78.00
12-20-46
Olga S. Freeland
12-24-46
53.00
1946 Sub-total
$202.00
12-26-46
Mr. T. C. Poole, Jr.
1- 4-47
$12.00
12-27-46
Mrs. Mary A. Gaines
1- 4-47
6.00
12-30-46
Leonard Smith
1- 4-47
3.00
1- 3-46
Mrs. E. H. 1- 4-47
6.00
1- 4-47
R. L. Banks
1- 4-47
68.00
3-15-47
Florence Satterwhite
4- 1-47
25.00
1947 Sub-total
120.00
Total
$322.00
*316 Petitioner's son, Harold, on petitioner's encouragement, accumulated several thousand dollars from 1939 through 1945. In December, 1943, Harold entrusted to petitioner $3,000 and in May or June, 1945, $2,000 in currency for safekeeping and the purchase of a home for himself, and petitioner placed these funds in his lock box at Texas State Bank. In July, 1945, petitioner advanced to his daughter-in-law, Martha Boyett, $800 in currency in order for her to buy some furniture. This advance $800of was made from the funds previously entrusted to petitioner by his son and did not represent income to petitioners. On May 3, 1946, petitioner took $1,000 in currency out of the lock box containing the funds belonging to his son to purchase a $1,000 money order payable to Wm. Vejans, in order to make an escrow deposit on a real estate contract. Later in 1946 petitioner replaced with funds of his own the $1,000 borrowed from his son. On May 23, 1946, the First National Bank of Jacksonville wired Velora Boyett, at her request, $1,000, in Tucson, Arizona, while petitioners were en route to California. Upon returning to Jacksonville Velora Boyett, on June 10, 1946, restored to her account in the *317 First National Bank $840 of the $1,000 previously wired to her, along with a salary check $119of, making a total deposit of $959. This $840 deposit did not constitute income to petitioners. Petitioner has rented nine bank safety deposit boxes during his lifetime. At the time of the hearing he had two bank lock boxes. One he acquired on May 5, 1941. The other he acquired in 1942. The instructions to the bank recorded on the bank record sheet for the first box are, "Mrs. Boyett as deputy." The instruction to the bank on the last box are, "No information to anyone." From 1936 to January, 1942, petitioner made several small loans from the Texas State Bank ranging from less than $100 a loan to a high of $255. On January 17, 1942, he borrowed $169.40 from the bank, on February 11, 1942, he borrowed $740.60, and on March 9, 1942, $84.70. Thereafter, through 1947, petitioner borrowed no money except in large amounts, his loans from March, 1942, through 1947 being as follows: February 9, 1943, $2,500; July 10, 1945, $1,500; March 13, 1947, $4,500. On December 4, 1945, petitioner procured from the First National Bank a bank money order for $1,000. This money order was deposited in the Harold *318 Boyett account on March 20, 1946. In a record book of petitioner's appear entries made by him showing his alleged account with his brother, W. E. Boyett, of the so-called "jug" money. One of these entries reads as follows: March 19, 1946 - Withdrawn WEB.
$1,075.00
3/20 (Dep. Tex. St. Bank) Petitioner's protest filed with the Bureau of Internal Revenue on April 7, 1947, also shows this $1,000 allegedly withdrawn from W. E. Boyett as deposited in the Texas State Bank on March 20, 1946. The above entry and statement in the protest were false. The money order was the $1,000 deposit made in the Harold Boyett account on March 20, 1946. Velora Boyett, from the time of her marriage in 1914 up through the taxable year 1947, a period of 33 years, never knew of petitioner keeping money in a jug. She lived with her husband during this entire 33-year period. From 1942 to 1947, inclusive, she usually went to his office several times a week. The $18,000 deposit made by petitioner in the Harold Boyett bank account in 1946 was all in currency bills of the smaller physical size which the Government began to make in 1928, and no currency of the larger size, made prior to 1928, *319 was contained in the deposit. The gross income of petitioners for the taxable years here involved was as determined by respondent, minus the items included by respondent which we have found did not constitute income. The returns filed by petitioner James L. Boyett for 1945, 1946, and 1947 were fraudulent with intent to evade tax. Part of the deficiencies in tax of petitioner James L. Boyett for each of the years 1945, 1946 and 1947 was due to fraud with intent to evade tax. The joint returns filed by petitioners for 1942, 1943 and 1944 were fraudulent with intent to evade tax. Part of the deficiencies in tax of petitioners for each of the years 1942, 1943 and 1944 was due to fraud with intent to evade tax. Opinion The first question is whether additional income was received in the years 1942 through 1947 which was not reported by petitioners and, if so, in what amounts. Petitioners assert that they correctly reported their gross incomes in the above years. They maintain that the appointment books of petitioner accurately showed his gross receipts from the practice of dentistry, petitioners' main source of income, and that they used these appointment books in making up their *320 income tax returns. However, none of the appointment books for any of the years 1942 to 1947, inclusive, the six taxable years here involved, were produced at the hearing, it being claimed by petitioners that the books for these particular years were accidentally destroyed by petitioner Velora Boyett and two grandsons in 1948, after respondent had questioned petitioners' returns for those years. The burden of proof that respondent's determination is in error is, of course, on petitioners. We can not assume that records not in evidence would, if produced, support petitioners' assertion that their returns accurately reported their income. Moreover, though petitioner and his office assistant testified that all collections were entered in these books, the indications are strongly to the contrary. A witness for respondent, a deputy collector of internal revenue, testified that he examined the appointment books for 1942 and 1943, page by page, in July, 1946. (He also examined the books for 1944, but the books for 1945, 1946 and 1947 were never shown respondent's agents). He stated that the books showed an average of four patients per day. Petitioner's office assistant, Marie Sales, *321 testified that from 1943 to 1947 petitioner had an average of four appointments per day plus six or eight other patients without appointments. Petitioner himself testified that he operated three dental chairs from 1942 through 1947, and his office assistants stated that the three chairs were usually full at the same time, petitioner working from one chair to the other. C. D. Acker, an officer of the Texas State Bank, in whose building in Jacksonville, Texas, petitioner had his offices, stated that during the years 1942 to 1947 petitioner "was very busy at all times. You couldn't get an appointment with him at that time." Other witnesses testified that he was a "hard worker" and "regarded as one of the leading dentists so far as his business was concerned." Petitioner himself testified that from 1943 on appointments had to be made five or six weeks in advance, and his office assistant said sometimes petitioner was so busy appointments had to be made three months in advance. The evidence is overwhelming that during the taxable years petitioner was a busy, hard-working dentist with a large and successful practice. During those years petitioner reported his net income from his profession *322 to be in the following amounts: 1942
$ 1,113.65
1943
1,809.74
1944
2,904.23
1945
3,608.00
1946
4,446.06
1947
4,318.37
Total
$18,200.05
Petitioners' several bank accounts, kept by petitioner under other people's names, show deposits during the taxable years which annually exceeded, by anywhere from about $2,000 to about $17,000, the reported gross receipts from his dental practice, as the findings show. No assertion is made by petitioners that this difference is by any means made up by their small amounts of reported income from other sources. During the six years when petitioner was reporting net income from his dental practice of from about $1,100 to about $4,500 annually, or a total business net income for the six years of $18,200.05, Dr. D. Brookshire, a dentist in Nacogdoches, Texas, a town of about the same size (8,000-10,000 population) as Jacksonville, Texas, where petitioner practices, reported net income from his practice of from about $10,000 to about $16,000 annually, or a total business net income for the six years of $87,420.13, and gross dental receipts annually exceeding those reported by petitioner by two or three times, as the findings *323 show. Even without this evidence as to the comparative reported earnings of petitioner and a dentist with a similar practice, it is obvious that petitioner's books, reporting collections from only four patients a day, greatly understated his dental receipts during the earlier years of the taxable years here involved, and that the returns allegedly based on these books were therefore inaccurate. In the absence of reliable records, it was necessary and proper for respondent to compute income for the earlier years here involved on the basis of petitioner's bank deposits. Section 41, Internal Revenue Code; Louis Halle, 7 T.C. 245; affd. (C.A., 2nd Cir., 1949), 175 Fed. (2d) 500; certiorari denied, 338 U.S. 949. In the absence of any records at all for the later years being shown respondent, it was of course also necessary and proper for him to compute income for these years on the basis of bank deposits and other information available. Respondent added to petitioner's gross income from his dental practice and other sources for the years here involved that portion of the bank deposits for each year which he determined constituted *324 unreported income, and, in addition, for 1945, 1946 and 1947, the amounts of checks which he determined were received by petitioner in his profession, cashed, but not deposited. Petitioners dispute respondent's determination in its entirety. Specifically, petitioner claims that three deposits by him in 1943 in the Harold Boyett account in the Texas State Bank in Jacksonville, totaling $7,650, two deposits to the same account in 1944 totaling $8,000, and one deposit to the same account in 1946 totaling $18,000, or a total of $33,650, was part of a total of $36,800 accumulated by petitioner in cash in various amounts and on different dates from 1904 to 1937. This money (referred to herein as the "jug" money), he claims to have given to his uncle, J. W. Boyett (died in 1941), as he earned it, to keep for him. He claims the uncle kept it buried under his home in Louisiana until August, 1939, when his health began to fail and he delivered it to petitioner in a thermos jug. Petitioner claims he at once delivered it in the thermos jug to his brother, W. E. Boyett, also in Louisiana, to keep for him, who kept it until he delivered it to petitioner in a thermos jug about the time petitioner *325 deposited same. According to petitioner's fantastic story, the major portion of the "jug" money, viz: $24,000, he made and delivered in cash to his uncle, J. W. Boyett, between 1904 and 1910. During 1904 to 1910, when a boy twelve to eighteen years old, he claims to have made "from $26,000 to $28,000" from the sale of cattle and cord-wood, but mostly from the sale of peaches grown in the orchard of the farm upon which the family was then living. It seems incredible that a boy of this age, even if a money-making prodigy as he would have us belive that he was, could have made such a large sum, especially in view of the size and set-up of the farm and the number of persons dependent upon it for support. Petitioner had several brothers and sisters and a brother-in-law all living on the farm at that time, his brother-in-law, aged about 30, being manager of the farm. All of them received most of their support from the farm and petitioner testified that his brothers and sisters each received their pro rata share from the farm's operation. There was also conflict in the testimony concerning petitioner's story about his youthful earnings. Petitioner claims that his father left 400 or *326 500 head of cattle and that in 1904, when only 12 years old, he sold $5,000 worth of these cattle, while his elder brothers, W. E. Boyett (hereinafter called W. E.), testified that his father left "possibly 150 head" of cattle, and that petitioner sold "a few" of them. W. E.'s testimony as to the volume of earnings from the sale of peaches does not jibe with that of petitioner. In each of the years in question, petitioner and W. E. were equally engaged in selling peaches from the family orchard. W. E. testified that the largest annual sum he ever realized from such sale was about $1,800 in 1904, while petitioner claims to have netted annually from the sale of peaches in these years "from $2,500 to $3,000 and sometimes more." There is also a conflict in petitioner's and W. E.'s testimoney as to the peach crops in the different years, W. E. claiming that 1904 was the bumper peach crop year and that shortly thereafter the orchard began to die, while petitioner claims that 1904 and 1905 were not very good peach years, but that in 1906, 1907 and 1908, "the universe tried to turn to peaches," both agreeing that the orchard was dead in 1910. Petitioner testified that the peach orchard contained *327 about 100 acres, W. E. was uncertain as to the acreage, while H. L. Boyett, an uncle of and older than petitioner and W. E., testified that the orchard did not contain more than 15 or 20 acres, and that there were only 40 acres of all crops in cultivation in the entire farm. The "jug" money story is replete with other discrepancies and implausible features. To mention some of them: Petitioner maintains that he had a trait inherited from his family of distrusting banks. Yet he does not deny that he has had several bank accounts and safe deposit boxes before and during the years here in question. Similarly, he maintains that he had a "fear psychosis" and liked the feel and possession of large sums of money. Yet according to the "jug" story, most of his hoarded money was kept buried under his uncle's home several hundred miles from his home in Jacksonville, in another state, for 29 years. In petitioner's sworn application for compensation and vocational training filed with the Veterans Bureau in December, 1922, he stated that he worked as an assistant pharmacist at $75 per month in 1915, 1916 and 1917 and that he was not engaged in any other occupation or trade. At the hearing *328 petitioner testified that in addition to his drug store jobs during this period he bought and sold scarce chemicals, and that the profits became part of the "jug" money. At one point in his testimony petitioner states that he made possibly $1,000 or $1,500 from this business. At another point he states he made $2,000 or $3,000 therefrom. In the sworn Veterans Bureau application petitioner stated he worked from July 16, 1919, to December, 1922, as an assistant pharmacist for $150 per month and that he had no other occupation. At the hearing petitioner testified he worked for a year as a pharmacist for $185 per month from the date of his discharge in June, 1919, and then worked for $350 a month until December, 1922. Including the $24,000 petitioner claims to have saved as a boy on the farm, $34,000, or almost all, of the "jug" money had been saved by 1927, according to petitioner. Yet the banker who took the deposit of $18,000 of the alleged "jug" money in 1946 testified the $18,000 was all in the small-sized bills not made by the Government until 1928 and thereafter. This circumstance contradicts and impeaches petitioner's testimony that the entire amount of the bank deposits in *329 question made by him in the taxable years was from the "jug" money which his uncle and his brother, W. E., had hoarded and kept buried for him in Louisiana since 1927, and it also impeaches the testimony of his brother, W. E., his chief corroborator as to the "jug" money, who testified that he had kept this old and long hoarded money after the uncle had ceased to do so, and that he delivered same to petitioner at about the time the same was deposited. At the hearing petitioner did not explain or offer testimony as to this discrepancy in the size of the currency bills, but in his reply brief seeks to avoid the effect of this damaging evidence by asserting: (1) "That a part of these funds were in gold specie and in 1933 J. W. Boyett converted the gold into currency," and (2) "At various times petitioner made withdrawals from these funds held by J. W. Boyett and later replaced same." According to petitioner's evidence, only a very small portion of the "jug" money was ever in gold specie. It could not have been a large amount since petitioner testified that $25,000 of the "jug" money had been saved in currency by 1921. The withdrawals, according to petitioner's testimony, consisted of *330 $1,000 to $2,000 in 1933 in his chicken venture, and $1,000 in 1938. Allowing for the conversion of the gold specie into currency, and the $3,000 in withdrawal replacements, the "jug" money, if petitioner's evidence is to be believed, must, when deposited, have contained between $25,000 and $30,000 in currency which had been accumulated prior to 1928 and necessarily was in the old large size bills, but it does not appear from the evidence that a single bill of this character was contained in the deposits in question. W. E., like petitioner, was not a convincing witness. There were contradictions in his testimony, the most striking being as to the amount of the "jug" money in 1921. In the forenoon he testified, in answer both to petitioner's counsel and to the Court, that the "jug" money in 1921, by actual count of petitioner and himself, consisted of $34,000. After the noon recess, he was again placed upon the stand and changed his testimony to make the amount $25,000 to conform to the testimony of petitioner previously given. Nor is petitioner's statement that he made between $6,000 and $8,000 from gambling in the army in 1918 and 1919, most of which went into "jug" money, and *331 $2,500 from gambling in 1937, which went into "jug" money, supported by the fact that he filed no returns in those years. Petitioner's sister testified that he was of a frugal nature. He stated himself that he even saved partially used patient cards in order to save money. Yet he borrowed continually from the banks from 1931 to 1942, for which loans he paid a high rate of interest, and he purchased lots in 1939 and 1940 with small cash payments, with balance payable on small monthly payments at 8 per cent interest. These activities can not be reconciled with petitioner's alleged ownership of thousands of dollars in cash during these years. Nor can the fact that three separate judgments were taken against petitioner in 1935. The only purported documentary evidence offered by petitioner in support of his "jug" story is unreliable and unsatisfactory, consisting of self-serving alleged memoranda in two record books of petitioner's with errors, erasures, insertions, and missing pages, and a letter penciled on a ledger sheet purportedly written by petitioner's uncle, J. W. Boyett, deceased, to petitioner in 1927, stating that he held $34,000 of petitioner's money. J. W. Boyett's son, *332 Horrie Boyett, merely said he thought the handwriting and signature were those of his father. The address on the envelope in which the letter was purportedly enclosed was written with pen and ink and is in a different handwriting from that in the body of the letter, as petitioner admitted. Neither the memoranda nor the letter were shown respondent's agents, though petitioner testified he knew he had the letter on hand when he was under investigation. In view of the above and many other weaknesses in the "jug" money story, we are not required to believe it. Carmack v. Commissioner (C.A., 5th Cir., 1950), 183 Fed. (2d) 1; certiorari denied, 340 U.S. 875; O'Laughlin v. Helvering (C.A.D., 1935), 81 Fed. (2d) 269; Rand v. Helvering (C.A., 8th Cir., 1935), 77 Fed. (2d) 450. Petitioners having failed in their burden of proof that the deposits we have enumerated totaling $33,650 constituted funds saved prior to the taxable years, we approve respondent's determination that such deposits constituted income in the years deposited. Moreover, whether the funds represented income from petitioner's profession, from gambling in which petitioner *333 admittedly participated during the taxable years, or from other sources, it was not incumbent on respondent to prove the exact source of such funds in order to determine that they constituted income. Hague Estate v. Commissioner (C.A., 2nd Cir., 1943), 132 Fed. (2d) 775; certiorari denied, 318 U.S. 787; Russell C. Mauch, 35 B.T.A. 617; affd. (C.A., 3rd Cir., 1940), 113 Fed. (2d) 555. See Carmack v. Commissioner, supra. Petitioners also challenge respondent's determination that the following two deposits constituted income to them in 1943 and 1945: (1) Deposit of check for $175 made by W. E. Boyett to petitioner's account, styled "Harold Boyett," First National Bank, Jacksonville, Texas, on November 24, 1943, and (2) Deposit of $1,000 check made by W. E. Boyett to petitioner's account, styled "Harold Boyett," Texas State Bank, Jacksonville, Texas, on January 16, 1945. Petitioners maintain that these two checks represented repayments in part of a loan of $2,375 made to W. E. Boyett by petitioner in 1933. At one point in the record petitioner stated the amount of the loan was $7,500. Moreover, W. E. Boyett was *334 unable to state what the amount of the loan was, and his testimony as to amounts and dates of repayment was extremely uncertain. At one point he said he did not recall the payment of $175. Then he amended this testimony a little later to say that he recalled the $175 as having been paid possibly in 1943 or 1944. He stated that the $1,000 was paid in 1946. However, the check here in question was deposited in 1945. The only purported documentary evidence introduced to establish the existence of this loan consisted of a penciled memorandum, allegedly made by petitioner in 1941, eight years after the alleged loan. Another memorandum, allegedly made by petitioner in 1946, with obvious alterations in the figures, states that $1,000 was repaid by W. E. Boyett by check dated January 16, 1944. With the discrepancies and inadequacies of this proof of the existence of the alleged loan, we have no alternative but to hold that petitioners have not overcome respondent's determination that the above two deposits were unexplained and constituted income to petitioners. Respondent determined that petitioners realized $800 taxable income from "other sources" in 1945 evidenced by a loan of $800 in cash *335 to Martha Boyett, petitioners' daughter-in-law, in July, 1945. Petitioner, his daughter-in-law, and his son, Harold Boyett, testified convincingly and without contradiction that the $800 in question represented an advance by petitioner to his daughter-in-law out of funds of Harold Boyett which petitioner was keeping for Harold Boyett, and we have so found. We accordingly hold that respondent erred in including the above amount of $800 in petitioners' income for 1945. Respondent determined that petitioners realized $1,000 taxable income from "other sources" in 1946 evidenced by the purchase with currency by petitioner on May 3, 1946, of a $1,000 money order payable to Wm. Vejans and used in payment for real estate. Petitioner testified that this $1,000 was borrowed from funds of Harold Boyett entrusted to petitioner, and therefore petitioners maintain that the $1,000 did not evidence undisclosed income of petitioner. However, he also testified that shortly afterwards in 1946 he replaced the $1,000 borrowed from his son's funds with $1,000 of his own from alleged "jug" money. The money order was, therefore, paid for with petitioner's own funds. We have already stated our reasons for *336 holding the alleged "jug" money not satisfactorily explained by petitioners as constituting money saved prior to the taxable years and that it was therefore income in those years. We accordingly hold that the purchase of the $1,000 money order in question evidenced income of petitioner in 1946, as determined by respondent. Respondent determined that petitioners realized $840 taxable income from "other sources" in 1946 evidenced by the deposit of $840 in currency to the account of petitioner Velora Boyett in the First National Bank, Jacksonville, Texas, on June 10, 1946. However, the uncontradicted testimony of petitioners and of J. P. Dixon, assistant cashier of the First National Bank, and the ledger sheet of Velora Boyett's account in that bank, show clearly that this amount was merely a redeposit of what was left of $1,000 from her account which Velora Boyett had had telegraphed to her while on a trip some two weeks earlier, and we have so found. We accordingly hold that respondent erred in including the above deposit of $840 in petitioners' income for 1946. Respondent determined that petitioners realized $202 taxable income from business in 1946 evidenced by the deposit of *337 a check for $202 payable to petitioner, payer A. L. Bowman, to the J. L. Boyett account in the Texas State Bank on September 16, 1946. Petitioner testified that this represented the repayment of a loan by him to Bowman earlier in 1946 out of cash which he carried in his pocket. In effect, then, this was a deposit of $202 cash by petitioner. We have already stated our reasons for holding that respondent was entitled to determine petitioner's income from his bank deposits and we accordingly hold that the $202 deposit in question constituted income to petitioners, as determined by respondent. Respondent included in petitioners' gross income as checks cashed, but not deposited, a total of $1,017.05 in 1945, $1,630.55 in 1946, and $1,280.25 in 1947. However, petitioners have established that, of these, checks totaling $202 in 1946 and $322 in 1947 were actually cashed and deposited in the account petitioner kept under the name of "Ann Newman" in the Texas State Bank, and therefore did not constitute income in addition to unexplained bank deposits, and we have so found. But petitioners urge that this method of determining income by adding to bank deposits checks cashed but not deposited *338 is improper in its entirety in that, first, it ignores any use of proceeds of cashed checks for business expenses and, secondly, it causes a double reporting of income whenever petitioner cashed a check and then subsequently deposited the proceeds. We see no merit in this contention of petitioners. As to the first point, any cash expenditures made by petitioner to pay business expenses would presumably, if properly substantiated, have been allowable as deductions. Many business expenses were claimed by petitioners in the taxable years and allowed by respondent; many were disallowed. The issue here is solely one of inclusions in gross income. As to the second point, it would seem unlikely that a man would make one trip to the bank to cash a check and then return at a later date to deposit the proceeds. At any rate, if there were any such duplications, the burden was on petitioners to show them, and they have not met this burden. In our opinion, respondent's inclusion in petitioners' gross income of only unexplained bank deposits and certain checks cashed but not deposited was eminently conservative. Petitioner admittedly had the habit of carrying on his person large amounts of cash *339 from his business cash receipts. He testified that he deposited it from week to week. He then testified as follows: "Q. Did you spend some of it? "A. No sir. "Q. Well, how did you keep it apart from the money you did spend? "A. I didn't do much spending. I charged almost everything that I consumed and paid for it by check." However, the deputy collector who investigated petitioners' returns for 1942 and 1943 testified that he called on petitioner in July, 1946, and: "I asked the Doctor if he deposited all of his receipts and he said 'no'." I asked him if he used part of the money to be received to pay his expenses, ordinary expenses, that he would incur during the week and he said 'yes'. * * * the Doctor said that he had paid part of his expenses by cash that he had received." We find it improbable that any man could carry large amounts of business cash in his pocket from week to week, apparently unsegregated from personal cash and never spend a cent thereof for the many major and minor expenses of daily living, nor for the gambling in which petitioner sometimes participated. The conclusion is inescapable that in addition to bank deposits and checks cashed but not deposited *340 petitioner received cash in his practice which was not reported as income, yet which respondent did not include in his determination of petitioners' gross income. Hence our observation that that determination was conservative. Certainly petitioners have not met their burden of showing that respondent's determination was in error except as to the few items we have listed, and for all the reasons we have already given we approve that determination, with the exceptions noted, for all the years here involved. The second issue herein is whether petitioners are liable for the fraud penalties imposed. Respondent has the burden of proving fraud. As said in Wallace H. Petit, 10 T.C. 1253: "* * * Because direct and clear-cut proof of fraud is seldom available, it must be established by a full consideration of the records and testimony offered, the appearance and manner of the witnesses, the conduct of the taxpayer, and all conditions and circumstances surrounding the transactions which produced the disputed income." We think that the record and circumstances herein overwhelmingly indicate that the omission of large amounts of income by petitioner James L. Boyett from his individual *341 returns and from the joint returns for each of the years here involved was due to fraud with intent to evade tax. As said in M. Rea Gano, 19 B.T.A. 518, 533: "A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose." The understatement in petitioner's books of his dental collections, the destruction of the books for the years here involved, the concealing of funds by deposits in other people's names, the "patently lame and untenable" explanations for deposits, such as that some $24,000 represented his savings of some 35 or 40 years ago as a boy on a farm, before the income tax laws were in effect, - all these factors and many others unmistakably point to fraud. As we have indicated, we are not convinced by petitioner's implausible and contradictory explanations of this remarkable concatenation of unfavorable circumstances. We hold that petitioner James L. Boyett is liable for fraud penalties of 50 per cent of the deficiencies in his individual returns for 1945, 1946 and 1947, and that petitioners are liable *342 for fraud penalties of 50 per cent of the deficiencies in their joint returns for 1942, 1943 and 1944. As for petitioner Velora Boyett, respondent has given no proof that she had knowledge of her husband's income during the years here involved or that she was in any way party to the concealment of his income, or that she attempted to conceal any income of her own. Therefore, as to the deficiencies in the individual returns filed by Velora Boyett in 1945, 1946 and 1947, we hold that no fraud penalty attaches. As for the years 1942, 1943 and 1944, when joint income tax returns were filed by petitioners, the liability for taxes and penalties is joint and several. Myrna S. Howell, 10 T.C. 859; affd. (C.A., 6th Cir., 1949), 175 Fed. (2d) 240. Accordingly, we have no alternative but to hold that, even though the fraud was that of the husband alone, the imposition of penalty of 50 per cent of the deficiencies in the joint returns filed for 1942, 1943 and 1944 is mandatory. Decisions will be entered under Rule 50.